Mario Ruiz MASSIEU, Plaintiff,

v.

Janet RENO, In Her Capacity as the Attorney General of the United States; Warren Christopher, In His Official Capacity as Secretary of State of the United States; United States Department of Justice Immigration and Naturalization Service; Warren A. Lewis, In His Capacity as District Director of the Immigration and Naturalization Service; and Demetrius Georgakopoulos, In His Capacity as Assistant District Director, Investigations, Defendants.

Civil Action No. 96–104 (MTB).

United States District Court,
D. New Jersey.

Feb. 28, 1996.

Fleming, Roth & Fettweis by Cathy A. Fleming, Newark, New Jersey, J.A. Canales, Canales & Simonson, Corpus Christi, TX, for Plaintiff.

Gary G. Grindler, Deputy Assistant Attorney General, David J. Kline, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Defendants.

## OPINION

BARRY, District Judge.

Plaintiff, Mario Ruiz Massieu, seeks a permanent injunction enjoining the deportation proceeding instituted against him pursuant to 8 U.S.C. § 1251(a)(4)(C)(i) and a declaration that the statute, which has not previously been construed in any reported judicial opinion, is unconstitutional. That statute, by its express terms, confers upon a single individual, the Secretary of State, the unfettered and unreviewable discretion to deport any alien lawfully within the United States, *not* for identified reasons relating to his or conduct in the United States or elsewhere but, rather, because that person's mere presence here would impact in some unexplained way on the foreign policy interests of the United States. Thus, the statute represents a breathtaking departure both from well established legislative precedent which commands deportation based on adjudications of defined impermissible conduct by the alien in the United States, and from well established precedent with respect to extradition which commands extradition based on adjudications of probable cause to believe that the alien has engaged in defined impermissible conduct elsewhere.

Make no mistake about it. This case is about the Constitution of the United States and the panoply of protections that document provides to the citizens of this country and those non-citizens who are here legally and, thus, here as our guests. And make no mistake about this: Mr. Ruiz Massieu entered this country legally and is not alleged to have committed any act within this country which requires his deportation. Nor, on the state of this record, can it be said that

there exists probable cause to believe that Mr. Ruiz Massieu has committed any act outside of this country which warrants his extradition, for the government has failed in four separate proceedings before two Magistrate Judges to establish probable cause. Deportation of Mr. Ruiz Massieu is sought merely because he is here and the Secretary of State and Mexico have decided that he should go back.

The issue before the court is not whether plaintiff has the right to remain in this country beyond the period for which he was lawfully admitted; indeed, as a "non-immigrant visitor" he had only a limited right to remain here but the right to then go on his way to wherever he wished to go. The issue, rather, is whether an alien who is in this country legally can, merely because he *is* here, have his liberty restrained and be forcibly removed to a specific country in the unfettered discretion of the Secretary of State and without any meaningful opportunity to be heard. The answer is a ringing "no".

### I.

The facts of this case read more like a best-selling novel than a typical deportation proceeding. Mario Ruiz Massieu, a citizen of Mexico, is a member of one of Mexico's most influential and politically active families, and, in recent years, has occupied several positions at the upper-most echelons of the Mexican government. For much of the past twenty years, Mr. Ruiz Massieu lived an academic life both as a professor and director of the National University of Mexico. During that time, he authored a number of books on topics such as education, history, law and politics. In 1993, however, Mr. Ruiz Massieu was thrust into the vanguard of Mexican politics as a member of the Institutional Revolutionary Party ("the PRI"), Mexico's only established ruling party. He was appointed Deputy Attorney General in 1993, Under Secretary for the Department of Government in 1994, and Deputy Attorney General, again, in May of 1994.[1]

---

1. Immediately prior to his first appointment as

Deputy Attorney General, Mr. Ruiz Massieu had,

On September 28, 1994, Mr. Ruiz Massieu's brother, Jose Francisco Ruiz Massieu—Secretary General of the PRI and an outspoken critic of the Mexican political system—was assassinated.[2] Within hours, Mario Ruiz Massieu, as Deputy Attorney General, began an investigation into his brother's murder. In the ensuing weeks, fourteen people were apprehended and indicted as part of a conspiracy uncovered through Mr. Ruiz Massieu's investigatory efforts. Many of the arrested conspirators named Manuel Munoz Rocha, a PRI official, as the architect of the conspiracy. Mr. Munoz Rocha, however, was shielded by official immunity, and could not be interviewed by the Attorney General's office in connection with the case. Mr. Ruiz Massieu requested that President Carlos Salinas de Gortari waive Rocha's immunity, a request that the PRI vigorously opposed. Eventually, the immunity was waived, but not before Mr. Munoz Rocha had disappeared. He was never interviewed or arrested, and remains unaccounted for to this day.

Fifty-seven days after his brother's assassination, Mr. Ruiz Massieu resigned as Deputy Attorney General and withdrew his membership in the PRI. In a dramatic and widely publicized speech on November 23, 1994, Mr. Ruiz Massieu announced that he was resigning from both his office and his party because of the PRI's continuous efforts to frustrate his investigation into his brother's murder. Specifically, he alleged that the PRI was obstructing his search for the persons who might have ordered former Deputy Munoz Rocha to act—persons whom Mr. Ruiz Massieu alleged to be very high-ranking members of the PRI.

In February of 1995, Mr. Ruiz Massieu published a book elaborating on the themes of his resignation address entitled *Yo Accuso: Denuncia De Un Crimen Politico* ("I Accuse: Denunciation of a Political Crime").

Immediately, Mexican authorities alleged that Mr. Ruiz Massieu committed the crimes of intimidation, concealment and "against the administration of justice" (a crime analogous to obstruction of justice in this country) in connection with the investigation of his brother's assassination. Contemporaneously, Mr. Ruiz Massieu claimed that he and his family began to receive both death and kidnapping threats. On March 2, 1995, he appeared for an official interrogation before Mexican authorities concerning the allegations of his criminal activity committed while in office. (See 1/11/96 Bond Memorandum, Fleming Aff.Exh. K.)

Later that same day, Mr. Ruiz Massieu and his family lawfully entered the United States as non-immigrant visitors at Houston, Texas, where they have owned a home since October of 1994. After remaining at their Houston home for the night, the family boarded a plane en route to Spain. When the plane touched down at Newark Airport on March 3, 1995, Mr. Ruiz Massieu was arrested by United States Customs officials, pursuant to 31 U.S.C. § 5316, on a charge of reporting only approximately $18,000 of the $44,322 in his possession. The charge was never pursued and was subsequently dismissed at the government's request.

On March 5, 1995, two days after his arrest in Newark, a Mexican court issued an arrest warrant for Mr. Ruiz Massieu charging him with intimidation, concealment, and "against the administration of justice." The following day, at Mexico's request, the United States presented a complaint for Mr. Ruiz Massieu's provisional arrest and sought his extradition to face the charges set forth in the Mexican arrest warrant. On June 9, 1995, a Mexican court consolidated the allegations into a single charge of "against the administration of justice".[3]

---

since 1990, been the Mexican Ambassador to Denmark.

2. Several months earlier, in March of 1994, Luis Donaldo Colosio, then the PRI presidential candidate, was also assassinated.

3. In the interim, the United States froze and seized, under seal and without notice or explanation, Mr. Ruiz Massieu's Houston bank account containing approximately nine million dollars. On June 15, 1995, the government instituted a civil forfeiture action against the account styled *United States v. Nine Million Forty One Thousand, Five Hundred Ninety Eight Dollars and Sixty Eight Cents*, Docket No. H–95–3182. The case is unresolved and is being actively litigated.

On June 13, 1995, the first extradition proceeding began before Magistrate Judge Ronald J. Hedges. After lengthy hearings at which both the government and Mr. Ruiz Massieu presented documentary evidence and oral testimony, Magistrate Judge Hedges declined to issue a certificate of extraditability. In so doing, he determined that the government had failed to demonstrate even probable cause to believe that Mr. Ruiz Massieu committed the crimes charged. (Tr. of 6/22/95 at 79, Fleming Aff.Exh. A.)

Significantly, Magistrate Judge Hedges also found that many of the statements submitted by the government were "incredible and unreliable", *id.*, and might have been altered to remove certain recantations and exculpatory statements. In addition, he found, and the government did not deny, that multiple statements were procured by torture inflicted by the Mexican authorities, including the inculpatory testimony of one of the government's primary affiants. *Id.* at 73, 79.

The government had lost its case, but not its will. On June 20, 1995, two days before Magistrate Judge Hedges issued his initial opinion, Mexico filed its second request for extradition based on newly filed charges of embezzlement. (Complaint # 6082G–01 filed June 20, 1995.) The charges focused on the $9,000,000 in the Houston bank account and 2,500,000 pesos allegedly disbursed without adequate documentation while Mr. Ruiz Massieu was in office. (Opinion of 9/25/95, Fleming Aff.Exh. B.) In an opinion filed September 25, 1995, Magistrate Judge Hedges again declined to issue a certificate of extraditability on the ground that the government had failed to demonstrate probable cause, or present any evidence whatsoever, that the funds had been illegally obtained or disbursed. *Id.*

Undeterred, on August 31, 1995, the government refiled its initial request for extradition based on the charge of "against the administration of justice". (Complaint # 95–0612G–01 filed August 31, 1995.) Although

the government produced nine new statements allegedly incriminating Mr. Ruiz Massieu, Magistrate Judge Hedges remained unpersuaded. By letter opinion dated November 13, 1995, the court again ruled that there was no probable cause to believe that Mr. Ruiz Massieu committed the acts alleged, and dismissed the complaint. (Fleming Aff.Exh. C.)

On October 10, 1995, the government instituted yet a fourth extradition proceeding by refiling its prior application based on the previously rejected embezzlement charges. This time, the application was heard before Magistrate Judge Stanley R. Chesler. Both Mr. Massieu and the government submitted new documentary evidence and presented live testimony. Near the end of the hearings, the government produced evidence which "clearly establishe[d]" that 800,000 of the alleged 2.5 million pesos embezzled were not, in fact, proceeds of the alleged embezzlement. (Transcript of 12/22/95 at 13, Fleming Aff.Exh. D.) Thereafter, the United States Attorney's Office for the District of New Jersey withdrew from further representation of the Mexican government.

With the United States Attorney's Office out of the case, the United States Department of Justice stepped in and continued to press for Mr. Ruiz Massieu's extradition on the embezzlement charges. Like Magistrate Judge Hedges before him, Magistrate Judge Chesler issued a lengthy opinion denying the certification of extraditability. (Transcript of 12/22/95 at 22, Fleming Aff.Exh. D.) Focusing on the government's paucity of evidence, Magistrate Judge Chesler stated that "the bottom line is that the government's efforts to establish an inference of criminality on the basis of unexplained wealth fails because it does not rise to the level where any nexus between those funds and the funds which Mr. Massieu is alleged to have embezzled has been established." *Id.* at 13–14. On January 11, 1996, a Mexican court dismissed the embezzlement charges.[4]

4. The charge of "against the administration of justice" apparently is still pending against Mr. Ruiz Massieu in Mexico. In addition, the government has informed the court that, since Mr. Ruiz Massieu has been detained in this country,

the Mexican government has filed charges of unjust enrichment, money laundering and torture against him. (Def.'s Reply in Opp. to Pl.'s Mot. for Inj. Relief at 2–3.) Neither Mexico nor

With that, the government seemingly accepted defeat as to Mr. Ruiz Massieu's extraditability. It was then, however, that this case took a turn toward the truly Kafkaesque. On December 22, 1995, immediately after Magistrate Judge Chesler issued his opinion, Mr. Ruiz Massieu was taken into custody by the Immigration and Naturalization Service ("the INS") pursuant to a previously unserved and unannounced detainer dated September 29, 1995. In addition, he was served with an INS Order to Show Cause and Notice of Hearing. The notice advised Mr. Ruiz Massieu that he was ordered to show cause as to why he should not be deported because,

> [t]he Secretary of State has made a determination that, pursuant to Section 241(a)(4)(C) of the Immigration and Nationality [sic] Act, 8 U.S.C. § 1251(a)(4)(C), there is reasonable ground to believe your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States;

(Fleming Aff.Exh. H.) No further explanation of the ground for Mr. Ruiz Massieu's alleged deportability was tendered.

Sometime after notice was served on Mr. Ruiz Massieu, the INS produced an October 2, 1995 letter addressed to Attorney General Janet Reno from Secretary of State Warren Christopher.[5] (Fleming Aff.Exh. I.) The letter urged the Attorney General to effect Mr. Ruiz Massieu's "expeditious deportation" *"to Mexico"* based on the Secretary's conclusion that Mr. Ruiz Massieu's presence in the United States will have potentially serious adverse foreign policy consequences for the United States. *Id.* The letter referenced the "serious allegations" that are pending in Mexico against Mr. Ruiz Massieu and the recent strides that both governments have taken in "our ability to cooperate and confront criminality on both sides of the border." *Id.* At bottom, the Secretary's request was premised on the proposition that "[o]ur inability to return to Mexico Mr. Ruiz Massieu—a case the Mexican Presidency has told us is of the highest importance—would jeopardize our ability to work with Mexico on law enforcement matters. It might also cast a potentially chilling effect on other issues our two governments are addressing." *Id.*

The relevant deportation statute, § 241(a)(4)(C)(i) of the Immigration and Nationality Act ("INA"), provides simply that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable". 8 U.S.C. § 1251(a)(4)(C)(i). Because an indication of the Secretary of State's belief is all that the statute by its terms requires, the October 2, 1995 letter, alone, comprised (and remains) the universe of evidence that the INS has offered to support its charge of Mr. Ruiz Massieu's deportability. A master calendar proceeding, the first stage of deportation hearings held pursuant to section 242 of the INA, was scheduled to begin on January 19, 1996. On January 17, 1996, however, Mr. Ruiz Massieu filed a complaint in this court requesting that the deportation proceedings be preliminarily and permanently enjoined, and that section 241(a)(4)(C) of the INA be declared unconstitutional.

The complaint contains three core constitutional claims: (1) the deportation proceeding evidences selective enforcement in retaliation for Mr. Ruiz Massieu's exercise of his First Amendment right to criticize the Mexican political system; (2) the deportation proceeding represents a "de facto" extradition and is an attempt to overrule, albeit indirectly, four federal court decisions, in violation of the separation of powers; and (3) section 241(a)(4)(C)(i) of the INA is unconstitutionally vague, in violation of the due process clause of the Fifth Amendment. The United States Department of Justice, on behalf of all defendants, has responded that section 241(a)(4)(C)(i) withstands constitutional attack both facially and as applied to Mr. Ruiz Massieu. In addition, it has taken the position that this court lacks jurisdiction to hear the case on the grounds that (1) what is at issue is a nonjusticiable political question; (2)

---

the United States has ever moved to extradite Mr. Ruiz Massieu on these charges.

5. Because of the importance of this letter, a copy is attached as an exhibit to this opinion.

Mr. Ruiz Massieu has failed to exhaust his administrative remedies under the INA; and (3) the doctrine of constitutional avoidance counsels against this court reaching the ultimate issues presented in Mr. Ruiz Massieu's complaint.

On January 18, 1996, this court held a hearing on Mr. Ruiz Massieu's motion for a temporary restraining order. At that hearing, this court stayed the deportation proceedings—a stay that remains in force—so that the parties could have adequate time to brief the complex issues raised, and so that this court could consider the issue of its jurisdiction as well as the issues the parties had raised. Having carefully reviewed the parties' submissions, and having held a further hearing, it is clear that the court has jurisdiction and has jurisdiction to decide, as it now does, that § 241(a)(4)(C)(i) of the INA, 8 U.S.C. § 1251(a)(4)(C)(i), is void for vagueness; deprives Mr. Ruiz Massieu, and any other alien similarly situated, of the due process right to a meaningful opportunity to be heard; and is an unconstitutional delegation of legislative power. The remainder of this opinion will be limited strictly to a discussion of jurisdiction and to these three bases for concluding that the statute cannot pass constitutional muster.

## II.

### A. *Jurisdiction*

■ The government has argued that this court lacks jurisdiction over the entirety of plaintiff's complaint. Accordingly, it is to that issue that this court must first direct its attention. The jurisdictional quagmire resulting from the unique procedural setting of this case is complex to say the least. Clearly, as plaintiff suggests, this court is authorized under 28 U.S.C. § 1331 to exercise subject matter jurisdiction over claims arising under the Constitution of the United States. Were that the end of the matter, the issue would be an easy one. "[F]ederal courts are vested with a virtual 'unflagging obligation' to exercise the jurisdiction given them." *McCarthy v. Madigan,* 503 U.S. 140, 146, 112 S.Ct. 1081, 1087, 117 L.Ed.2d 291 (1992). When a federal agency is involved, however, the court must look beyond its general grant of subject matter jurisdiction to determine whether Congress has removed a particular case from within the ambit of the court's jurisdiction through the general judicial review provisions of the Administrative Procedure Act ("the APA"), 5 U.S.C. § 701, *et seq.* and the more specific provisions of the relevant agency statute, here, the INA, 8 U.S.C. § 1105a.

■ The APA provides for judicial review to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute," 5 U.S.C. § 702, as long as no statute precludes such relief or the action is not one committed to agency discretion by law, 5 U.S.C. § 701(a). Section 703 of the APA further limits judicial review by providing that "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action ... in a court of competent jurisdiction." 5 U.S.C. § 703. Interpreting these provisions, the Supreme Court has long held that the APA embodies a presumption favoring the availability of judicial review and that only upon a showing of "clear and convincing evidence" of contrary legislative intent should the courts restrict access to a federal forum. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

■ Applying the APA's standards to the case at bar, it cannot seriously be argued that plaintiff has not been "adversely affected" by agency action. 5 U.S.C. § 702. He currently is imprisoned as a result of action taken by the INS and has been declared deportable by the Secretary of State. Thus, as the APA directs, this court next must examine the relevant provisions of the INA to determine whether judicial review at this time is statutorily foreclosed. Section 106(a) of the INA provides that "the sole and exclusive procedure" for review of a final order of deportation is the procedure provided for in chapter 158 of Title 28 of the United States Code (the Hobbs Act). 8 U.S.C. § 1105a(a). The Hobbs Act, in turn, provides the now-

familiar procedure by which review of final agency action may be had exclusively in the appropriate court of appeals.[6] 28 U.S.C. § 2342 *et seq.* In addition, the INA provides that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations...." 8 U.S.C. § 1105a(c). Thus, reading the INA in the context of section 701 of the APA and its recognized presumption in favor of judicial review, it is obvious that Congress did not intend to preclude all judicial review of deportation determinations.[7] The ultimate jurisdictional question presented by this unique case, then, is whether this court has jurisdiction over plaintiff's constitutional claims prior to the issuance of a final deportation order and the exhaustion of his administrative remedies.

■ The issue of when and where a constitutional claim arising during the course of an administrative proceeding should be heard is one of the most vexing questions in administrative law. As a threshold matter, it should be noted that both parties, as well as this court, agree that the immigration judge ("IJ") presiding over the deportation proceeding would be without jurisdiction to hear plaintiff's constitutional challenge to section 241(a)(4)(C) of the INA. *See Thunder Basin Coal Co. v. Reich,* ––– U.S. –––, –––, 114 S.Ct. 771, 780, 127 L.Ed.2d 29 (1994) ("we agree that adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"); *McCarthy v. Madi-*

*gan,* 503 U.S. 140, 147–48, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992) ("an agency, as a preliminary matter, may be unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute"); *Mathews v. Diaz,* 426 U.S. 67, 76, 96 S.Ct. 1883, 1889, 48 L.Ed.2d 478 (1976) (noting that constitutional question was beyond the competence of the Secretary of Health, Education and Welfare.)

■ Conceding that much, the government relies on *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), for the proposition that constitutional questions which cannot be raised before an IJ can only be raised and addressed in the appropriate court of appeals when the remedies made available within the agency have been exhausted and a final agency determination has been rendered. In *Chadha,* the Supreme Court interpreted the term "final orders" of deportation in § 106(a) of the INA to include "all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." *Id.* at 938, 103 S.Ct. at 2777. Thus, because § 106(a) provides that "final orders" may be reviewed in the court of appeals, the court of appeals could likewise hear an alien's constitutional claim which the IJ could not consider. Accordingly, the government argues that because plaintiff will be able to raise his constitutional claims in the court of appeals following a final determination of deportability, the INA's exclusive review pro-

---

6. The government cites both *Conoco, Inc. v. Skinner,* 970 F.2d 1206 (3d Cir.1992) and *Modine Mfg. Corp. v. Kay,* 791 F.2d 267 (3d Cir.1986) for the proposition that the Hobbs Act should be liberally construed and that the courts of appeals should have sole jurisdiction "absent clear and convincing evidence of a contrary congressional intent." *Modine,* 791 F.2d at 270. In both of those cases, however, the court was reviewing an administrative agency's construction of a statute through the issuance of a regulation—a task clearly within the exclusive jurisdiction of the courts of appeals. In the case at bar, this court is in no way reviewing a rule, order, regulation, or interpretation of an agency. The only question before this court is the constitutionality of a statute enacted by Congress and a procedural scheme which Congress itself designed.

7. The government argues that § 241(a)(4)(C)(i) is a grant of "unfettered discretion" to the Secretary of State, rendering deportability determinations under that provision unreviewable, presumably pursuant to 5 U.S.C. § 701(a). (Def.'s Reply in Opp. to Pl.'s Mot. for Inj. Relief at 29.) This argument fails for two reasons. First, this court is reviewing the constitutionality of the statute, not a discretionary act of the Secretary. Second, as will be fully discussed in part III of this opinion, if Congress intended to vest the Secretary with "unfettered discretion" in a matter as important to an individual as deportation, then the unprecedented legislative design of § 241(a)(4)(C)(i) violates due process and is unconstitutional.

visions foreclose any other means of judicial review.

The government's argument is not without precedential support. In *Thunder Basin Coal Co.*, —— U.S. at ——, 114 S.Ct. at 780, the Supreme Court held that the district court lacked jurisdiction to hear the petitioner's due process challenge to the Federal Mine Safety and Health Act ("the Mine Act") because such claims could be meaningfully addressed in the court of appeals. *Thunder Basin Coal* is distinguishable from the case at bar, however, for two reasons. First, unlike the INS, there was evidence that the Mine Safety and Health Administration ("the MSHA") had considered certain constitutional claims in the past. *Id.* Second, the plaintiff in *Thunder Basin Coal* had brought, in addition to constitutional claims, certain statutory claims under the Mine Act that were uniquely within the MSHA's field of expertise. *Id.* Here, plaintiff has raised no statutory claims whatsoever but only claims which the INS concededly cannot consider.

The government's argument may be reduced to the proposition that if the court of appeals can hear a constitutional challenge after a plaintiff has exhausted his administrative remedies, a district court is without jurisdiction to intervene. While the government's position accurately reflects the general rule, it ignores, however, a long line of precedent in which courts have excused administrative exhaustion and finality requirements and have recognized the jurisdiction of the district courts to hear certain constitutional challenges in extraordinary cases.

■ Although exhaustion and finality requirements are often referred to as "jurisdictional," they are not unyielding. Rather, while the court's inquiry must always be guided by the congressional intent behind the particular administrative statute, "application of the exhaustion doctrine is 'intensely practical' and should be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 331 n. 11, 96 S.Ct. 893, 901 n. 11, 47 L.Ed.2d 18 (1976)). *See also Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–50, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967) (stating that doctrine of finality must be applied in a "pragmatic" and "flexible" way); *Rice v. United States Dep. of Alcohol, Tobacco and Firearms*, 68 F.3d 702, 708 (3d Cir.1995) ("[a] district court cannot consider a case without subject matter jurisdiction, but failure to exhaust is not always fatal"); *Lester H. v. Gilhool*, 916 F.2d 865, 869 (3d Cir.1990) (excusing exhaustion requirement where requiring exhaustion would be "futile"), *cert. denied, Chester Upland Sch. Dist. v. Lester H.*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

When Congress adopted § 106 of the INA, its stated intention was to remove from the district courts "the growing frequency of judicial actions being instituted by undesirable aliens whose cases ... are brought solely for the purpose of preventing or delaying indefinitely their deportation from this country." H.R. No. 1086, 87th Cong., 1st Sess., reprinted in 1961 U.S. Code Cong. & Admin. News 2950, 2967. Notwithstanding this express congressional intent and the exclusive language of §§ 106(a) and (c), however, courts have excused exhaustion under the INA for certain constitutional challenges. *See McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) (holding that district court had jurisdiction to hear constitutional challenge to INS procedures that was collateral to individual determinations); *Sewak v. INS*, 900 F.2d 667, 670 (3d Cir.1990) ("the exhaustion of administrative remedies [under § 106(c) ] is not always required when petitioner advances a due process claim"); *Rafeedie v. INS*, 880 F.2d 506 (D.C.Cir.1989) (R. Ginsberg, J., concurring) (recognizing jurisdiction of district court to hear alien's due process challenge to § 235(c) of INA).

■ "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion. '[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interest in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.' "

*McCarthy,* 503 U.S. at 146, 112 S.Ct. at 1087. Thus, to determine whether exhaustion may be excused in the case at bar, this court must balance the purposes underlying the exhaustion requirement against the potential injury to the plaintiff if he is forced to exhaust his administrative remedies. *See McCarthy v. Madigan,* 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Rafeedie,* 880 F.2d at 513 (opinion of the court).

■■■■■ A review of the objectives underlying the exhaustion requirement reveals that none of those objectives is served here. The exhaustion requirement "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy,* 503 U.S. at 145, 112 S.Ct. at 1086. The first of these purposes "applies with special force" when the action under review involves an act of agency discretion or calls upon the agency to apply its unique expertise. *Id.* By declaring § 241(a)(4)(C)(i) of the INA unconstitutional, this court is in no way interfering with the discretionary judgment of the INS or with the application of the agency's special expertise.[8] Nor is the court imposing its own interpretation of the statute upon the INS. Rather, the only question presented here is whether the INS's application of the statute at issue denies

plaintiff due process of law. *See Rafeedie,* 880 F.2d at 515.[9]

Thus, plaintiff's constitutional claim is entirely collateral to the merits of his deportability under the statute. "The Service must apply the statute as it believes Congress intended, and it has made clear [as will be discussed below] what it believes Congress to have wanted." *Id.* If its application of the statute is unconstitutional, "only a court can so declare." *Id.* Here, plaintiff does not ask this court to decide whether the criteria of § 241(a)(4)(C)—such as they are—have been met. Rather, he claims that the statute cannot constitutionally be applied to him or, for that matter, to anyone else. "[T]he agency has neither institutional competence nor expertise to bring to bear on the question whether [the statute] may constitutionally be applied...." *Id.* (holding that district court had jurisdiction to hear alien's due process claim prior to exhaustion of administrative remedies).

■■■■ The second of the purposes, promoting judicial efficiency, can be broken down into two subparts. First, exhaustion allows an agency to correct its own errors before the machinery of the judiciary is put in motion. *McCarthy,* 503 U.S. at 145, 112 S.Ct. at 1086. Here, however, the only error is that

**8.** The government has argued that, because asylum matters are uniquely within the expertise of the INS, this court must decline jurisdiction at this time to prevent premature interference with the agency's asylum determination. The flaw in the government's argument is that no claim for asylum is currently pending before the INS. Although plaintiff had applied for asylum with the District Director of Vermont prior to being served by the INS, that application was rejected, albeit on procedural grounds, and plaintiff has not refiled before the INS. The decision to request asylum is the alien's alone. Surely this court cannot require an alien to request asylum, when he otherwise would not, on pain of forfeiting all access to a federal court. To do so would not only prejudice countless aliens, but would clog the INS with meritless asylum applications filed only preserve the alien's right to judicial review.

Because the asylum issue is the only matter that the government has identified as requiring agency expertise, this court must likewise reject the government's argument that this court should abstain under the principle of "primary jurisdiction." That doctrine applies where a federal court has jurisdiction, but should postpone

exercising it until the agency has had an opportunity to resolve unavoidable issues requiring the unique expertise of an administrative agency. *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Here, plaintiff's complaint raises purely constitutional issues that require no factual development. Thus, plaintiff has presented no issues on which the INS is possessed with institutional competence, let alone expertise, to consider. Moreover, even if there were an asylum application pending before the INS, its resolution would be entirely collateral to the constitutional issues before this court and would in no way be a prerequisite to this court's ability to decide the case at bar. Under these circumstances, the doctrine of primary jurisdiction is wholly inapplicable.

**9.** Because the only questions presented to this court are of constitutional dimension, the government's invocation of the "constitutional avoidance" doctrine is misplaced. Where the issues are exclusively constitutional, the only way a court can avoid addressing a constitutional issue is to dismiss the case. Were the constitutional avoidance doctrine that strong, no constitutional question could ever be decided.

of Congress in enacting an unconstitutional statute which the INS is obligated to apply. Thus, because the only error is one of constitutional dimension, it is an error that cannot be remedied by the agency. *See McCarthy,* 503 U.S. at 147–48, 112 S.Ct. at 1088; *Rafeedie,* 880 F.2d at 529 (R. Ginsberg, J., concurring) ("because it is exceedingly unlikely that the INS will provide [plaintiff] with sufficient procedural safeguards . . . [plaintiff]'s constitutional claim would, in all likelihood, remain unchanged after the administrative process had run its course").

■ Second, exhaustion furthers judicial economy by affording the agency the opportunity to develop a factual record that may be relied upon by a reviewing court. *Id.* at 145, 112 S.Ct. at 1086. Here, the government has conceded that plaintiff's claims under § 241(a)(4)(C)(i) present "pure questions of law" for which no agency fact-finding would be required or even marginally illuminating. (Def.'s Opp. to Pl.'s Mot. for Temp.Restr.Order at 5). Under these circumstances, sending the case to the INS so that the IJ may find facts that do not exist or say that there are no facts to be found would be futile in the extreme. *See Lester H. v. Gilhool,* 916 F.2d at 869 (excusing administrative exhaustion requirement where district court is presented with a pure question of law); *Rafeedie,* 880 F.2d at 516, 529–30.[10]

■ Finally, the Supreme Court has recognized two unique sets of circumstances under which exhaustion may be excused because the purposes of the exhaustion requirement cannot be advanced almost by definition. The first is "where the challenge is to the adequacy of the agency procedure itself, such that 'the question of the adequacy of the administrative remedy . . . is for all practical purposes identical with the merits of the plaintiff's lawsuit.'" *McCarthy,* 503 U.S. at

148, 112 S.Ct. at 1088 (quoting *Barry v. Barchi,* 443 U.S. 55, 63 n. 10, 99 S.Ct. 2642, 2648 n. 10, 61 L.Ed.2d 365 (1979)). This is just such a case. § 241(a)(4)(C)(i) virtually prohibits the agency from affording an alien, such as plaintiff, the procedural due process which he is constitutionally guaranteed. Thus, the question of the "adequacy of the administrative procedure itself" *is* the "merits of the plaintiff's lawsuit." *Id.*

In *Rafeedie,* the Court of Appeals for the District of Columbia likewise was faced with an alien's due process challenge to the adequacy of the procedures available to him under the INA. 880 F.2d 506. There, then-Judge Ruth Ginsberg recognized that "it would be pointless to require him to exhaust an administrative procedure which all three members of this court seem to agree is not applicable to him merely so he can receive, in the end, the correct procedure." *Id.* at 528 n. 6 (citing *Bowen v. City of New York,* 476 U.S. 467, 484, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986) ("We should be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place"). In the case at bar, it would not only fail to further judicial economy, but would be an affirmative affront to it, if this court were to require plaintiff to subject himself to the inadequate procedures complained of for the sole purpose of subsequently allowing a court to declare those procedures unconstitutional.

■ The second extraordinary set of circumstances under which the Court has explicitly excused exhaustion is where the administrative body has "predetermined the issue before it." *McCarthy,* 503 U.S. at 148, 112 S.Ct. at 1088 (citing *Houghton v.*

---

10. In *Conoco, Inc. v. Skinner,* 970 F.2d 1206 (3d Cir.1992), the United States Court of Appeals for the Third Circuit affirmed the district court's determination that it lacked jurisdiction to hear the plaintiff's challenge to regulations issued by the United States Coast Guard and the Maritime Administration. In reaching its holding, the court reasoned that absent a need for fact-finding in the district court, jurisdiction should lie solely in the appropriate court of appeals. *Id.* at 1214. That case, however, involved the direct statutory review of regulations issued by the agencies. This court does not question the exclusive jurisdiction of the courts of appeals over such claims. In the case at bar, however, this court is not infringing on the courts of appeals' exclusive jurisdiction to review agency action. Rather, it simply is determining the constitutionality of a federal statute under unique circumstances that justify excusing plaintiff from the need to exhaust his administrative remedies.

*Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 2120, 20 L.Ed.2d 1319 (1968) (in view of Attorney General's submissions that the challenged rules of the prison were "validly and correctly applied to petitioner," requiring administrative review through a process culminating with the Attorney General "would be to demand a futile act")). This situation arose most starkly in *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). There, a number of aliens brought suit challenging a Social Security Act provision which made resident citizens eligible for medical insurance but denied eligibility to aliens who had not resided in this country for at least five years. The plaintiff aliens applied to the administration for medical insurance benefits and were denied. Thereafter, without having exhausted their administrative remedies, the plaintiffs brought a constitutional challenge in the district court. On appeal, the Secretary argued that the plaintiff's failure to exhaust deprived the district court of subject matter jurisdiction over the alien's constitutional claim. The Supreme Court disagreed:

> [a]lthough the Secretary moved to dismiss for failure to exhaust administrative remedies, at the hearing on the motion he stipulated that no facts were in dispute, that the case was ripe for disposition by summary judgment, and that the only issue before the District Court was the constitutionality of the statute.... [T]his constitutional question is beyond the Secretary's competence. Indeed, the Secretary has twice stated in this Court that he stipulated in the District Court that [plaintiff]'s application would be denied for failure to meet the durational residence requirement. For jurisdictional purposes, we treat the stipulation in the District Court as tantamount to a decision denying the application and as a waiver of the exhaustion requirements.

*Id.* at 76–77, 96 S.Ct. at 1889–90.

In a typical deportation proceeding under section 242 of the INA, an alien's ultimate deportability is determined by an IJ after a full administrative hearing. 8 U.S.C. § 1252(b). There, the alien is entitled to "a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1252(b)(3). Under section 241(a)(4)(C), however, the Secretary of State determines the alien's deportability.[11] In the case at bar, then, the determination of plaintiff's deportability has already been made.

Notwithstanding the Secretary's determination, the government has argued that plaintiff still is entitled to a section 242 hearing and that plaintiff's deportability will not finally be determined until that time. (Def.'s Opp. to Pl.'s Mot. for Temp.Restr. Order at 8–9.) The disingenuousness of the government's position, however, is evidenced by the myriad of representations to this court, from both the Attorney General's Office as well as the Office of Immigration Litigation, that because the Secretary has deemed plaintiff deportable, he is deportable, and plaintiff does not have the right to question that determination. The government has repeatedly stated that "[t]he Secretary's determinations under Section 1251's foreign policy ground are not reviewable because Congress has committed determinations based on that ground to the Executive's unfettered discretion" (Def.'s Reply in Opp. to Pl.'s Mot. for Inj.Relief at 29); "the question whether or not the alien is deportable is answered we believe by the [Secretary's October 2, 1995] letter" (Transcript of 1/18/96 at 27–28); "Massieu cannot obtain discovery on the Secretary's thought process.... [T]he letter can be examined only to determine whether it expresses a facially legitimate and bona fide reason for the Secretary's determination, and the court's [sic] cannot look behind it" (Def.'s Supp.Mem. at 33–36); "[d]iscovery may not be had of the Secretary's thought processes" (Def.'s Reply Mem. at 41).

Stated another way, the government's position is that because the Secretary's determination of deportability is based on facially

---

11. It bears repetition that § 241(a)(4)(C)(i) provides only that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."

legitimate and statutorily authorized grounds, i.e., serious adverse foreign policy consequences, that determination cannot be challenged or reviewed. As in *Diaz*, then, the only issue that would be before the IJ has, by the government's own repeated representations to this court, been conclusively pre-determined.

Moreover, like the situation in *Houghton v. Shafer*, 392 U.S. 639, 640, 88 S.Ct. 2119, 2120, 20 L.Ed.2d 1319, the Attorney General not only instigated the action against plaintiff, but also is both prosecutor and final arbiter. Even if the IJ and the Board of Immigration Appeals ("BIA") were to find plaintiff's deportation improper, the INA could appeal the adverse rulings to the Attorney General, herself.[12] (Def.'s Reply in Opp. to Pl.'s Mot. for Inj. Relief at 14 n. 4 (citing 8 C.F.R. § 3.1(h)(1)(iii)).) Thus, the administrative process culminates with the Attorney General, and, as was the case in *Houghton,* the Attorney General has already made her position abundantly clear to this court that plaintiff is deportable and should be deported. Under the circumstances, then, exhaustion would be wholly meaningless.

■ Having concluded that none of the purposes underlying the exhaustion requirement would be served in the case at bar, this court must examine the extent of the irreparable harm plaintiff would suffer if required to exhaust the administrative remedies available to him. As the facts of this case make clear, plaintiff's injury cannot be overstated. First, plaintiff remains incarcerated solely under the authority of an unconstitutional statute. *See Jolly v. Coughlin,* 76 F.3d at 482 (2d Cir.1996), (concluding that violation of constitutional rights, specifically unconstitutional confinement, raises presumption of irreparable harm). Moreover, the conditions of plaintiff's confinement are particularly onerous. At the time of the initial hearing before this court, plaintiff was being held at FCI Fairton, over 160 miles away from his family and counsel, in 24–hour lock-up. (Pl.'s Mem. of Law in Supp. of Mot. for Injunctive Relief at 10–11.) He was allowed one ten-minute telephone call per week. *Id.* He was not allowed a pen in his cell. *Id.* He was being given no exercise and no access to radio or television. *Id.* Since the hearing, plaintiff has been transferred to the Union County jail, where the conditions allegedly remain onerous, though somewhat less so. (Pl.'s 2/5/96 Letter Br. at 2.) Understandably, plaintiff's confinement, which became unconstitutional after the issuance of Magistrate Judge Chesler's December 22, 1995 opinion at which time plaintiff would have been released had he not been taken into custody by the INS, has led to a "major state of depression" for which he currently is receiving medication. (Psychiatric Report, Fleming Aff.Exh. J.)

The government has conceded that exhaustion of the administrative process is both "multi-tiered and time-consuming." (Def.'s Opp. to Pl.'s Mot. for TRO at 3.) After plaintiff's section 242 deportability hearing, he must appeal the pre-determined result to the Board of Immigration Appeals. Thereafter, he may be required to await review by the Attorney General. 8 C.F.R. § 3.1(h). Only then would plaintiff be heard in the court of appeals where he could raise, for the first time, his constitutional claims. This time-consuming process will only prolong the severe and unconstitutional deprivation of liberty which plaintiff presently must endure.[13] Plaintiff's constitutional injury accrues daily.

---

12. *This court sees no way, however, that the IJ or the BIA could do so. The IJ must apply the statute as written, and the statute unambiguously leaves the IJ no alternative but to accept the Secretary's determinations and to order plaintiff's deportation.*

13. *The government has argued that plaintiff's confinement is "self-inflicted" on account of his being denied bail as a risk of flight. Quite frankly, the government's argument is somewhat offensive. This court agrees that plaintiff repre-* sents a serious risk of flight. In fact, all he has wanted to do since he arrived in this country almost a year ago is leave. If fault is to be assigned, however, it must be laid at the feet of the government as opposed to plaintiff. It is the government that has argued for plaintiff's continued incarceration under what this court believes to be an unconstitutional statute after having failed on four separate occasions to extradite him. And it is the government, not plaintiff, that is the but-for cause of the irreparable harm that

Moreover, plaintiff has not been, and will not be, afforded due process of law throughout the administrative process. Thus, if this court were to require plaintiff to exhaust his administrative remedies, it would only be ensuring that his constitutional injury is maximized. It was in just such a case that the Supreme Court cautioned the judiciary to "be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." *Bowen v. City of New York,* 476 U.S. 467, 484–85, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986).

Finally, under the terms of the INA, there is a possibility that, if plaintiff were forced to exhaust his administrative remedies, he forcibly could be sent to Mexico before ever being able to raise his constitutional claims in a federal court. Section 106(a)(8) of the INA states that "nothing in this section [providing for appeals and access to a federal forum] shall be construed to require the Attorney General to defer deportation of an alien after the issuance of a deportation order granted by this section...." 8 U.S.C. § 1105a(a)(8). Of course, once the alien serves a notice of appeal on the appropriate INS official, his deportation is automatically stayed. 8 U.S.C. § 1105a(a)(3). There remains, nonetheless, a statutory possibility that, having been urged by the Secretary of State to "take all steps possible" to ensure plaintiff's "expeditious" deportation, the Attorney General would feel compelled to deport plaintiff at the earliest time authorized by law, i.e. before he files his notice of appeal. Should the Attorney General deport plaintiff immediately upon issuance of the order of deportation—just as he was detained on the spot the moment Magistrate Judge Chesler ruled—plaintiff would be denied all access to judicial review.

■■■ Obviously, excusing administrative exhaustion requirements must be the exception rather than the rule. This court is convinced, however, that the exhaustion balance in this unusual case tips powerfully in plaintiff's favor. Not one of the purposes underlying the doctrine would be served by

requiring exhaustion, and the irreparable harm to plaintiff by doing so would be immeasurable. Having decided that this court has jurisdiction to hear plaintiff's due process claims, it next must determine whether the issues are both ripe and justiciable.

### B. *Ripeness*

■■■ Plaintiff's claims are ripe for decision. The "basic rationale [behind the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). There is nothing in the least abstract about the challenge to the statute at issue—the relevant offending conduct has been accomplished and the issues presented are crystal clear. Likewise, this court is not convinced, and it would invite the government to peer through the bars of plaintiff's cell in an effort to persuade *him*, that the effects of the Secretary's decision have not been "felt in a concrete way."

### C. *Justiciability—The Political Question Doctrine*

■■■ The government contends that the dispute at issue is one over the foreign policy of the United States and, therefore, presents a nonjusticiable political question. According to the government, the wisdom of the Secretary's and the Attorney General's policy determinations cannot be reviewed by this or any other court. With the "wisdom" assertion, this court could not agree more. Neither the legislature's vast power over deportation issues, nor the executive department's exclusive control over matters of foreign policy, however, are enough to transform this dispute into a nonjusticiable political question.

Given the overtones of international diplomacy that infuse this case, it would not be

has been and will continue to be suffered by     plaintiff.

unreasonable to think of this controversy in political terms. As the Supreme Court has emphatically stated, however,

> the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by [the government].

*INS v. Chadha,* 462 U.S. 919, 942–43, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983). What is at issue in this case is not review of a foreign policy determination but, rather, the constitutionality of an act of Congress and the decision of the executive to enforce that act against an individual within this nation's borders, thus declaring that individual expendable. "No policy underlying the political question doctrine suggests that Congress or the Executive, or both acting in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a decision for the courts." *Id.* at 941–42, 103 S.Ct. at 2779. *See also Shahla v. INS,* 749 F.2d 561, 563 n. 2 (9th Cir.1984) (recognizing that while "the judicial branch must show deference to the political branches of government in foreign policy matters[,] [n]evertheless, we believe that the judicial branch may examine whether the political branches have used a foreign policy crisis as an excuse for treating aliens arbitrarily"). In short, this court finds the resolution of this constitutional controversy to be well within the role traditionally reserved for the judiciary.

### III.

### § 241(a)(4)(C)(i) IS UNCONSTITUTIONAL

This court now turns its attention to the substance of the challenge before it. In terms of due process, plaintiff attacks § 241(a)(4)(C)(i) of the INA on two distinct, though related, grounds. The first contention is that the statute is void for vagueness. The second is that, by its terms, the statute

denies plaintiff, and any alien deported thereunder, a meaningful opportunity to be heard before being subjected to the severe deprivation of liberty that is deportation. Additionally, the court has *sua sponte* raised the issue of whether the statute is so devoid of standards that it represents an unconstitutional delegation of legislative power to the executive.

As a threshold matter, this court recognizes the awesome power of the political branches of government over matters of immigration and deportation. As the Supreme Court has made clear, " 'over no subject is the legislative power of Congress more complete than it is' over the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)). Indeed, the power is so great that Congress may enact laws with respect to aliens that "would be unacceptable if applied to citizens." *Id.* Moreover, because immigration policies often "may implicate our relations with foreign powers," decisions of the legislature and the executive concerning aliens are subject only to the most limited judicial review. *Id.* at 796, 97 S.Ct. at 1480 (quoting *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976)).

Notwithstanding the political branches' near plenary power over aliens, this power is circumscribed by the constitutional constraints imposed on the exercise of all governmental authority. It is a fundamental tenet of the law in this area that both the Fifth and Fourteenth Amendments protect aliens from the deprivation of life, liberty and property without due process of law. *Mathews v. Diaz,* 426 U.S. at 77, 96 S.Ct. at 1890; *see also Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings"). Indeed, every alien, "[e]ven one whose presence in this country is unlawful, involuntary, or *transitory* is entitled to that constitutional protection."[14]

---

**14.** Accordingly, this court initially must reject the government's implicit argument that, because

aliens do not possess a constitutional right to be in this country and are permitted to remain here

*Mathews v. Diaz,* 426 U.S. at 77, 96 S.Ct. at 1890 (emphasis added).

## A. *Void-for-Vagueness*

■ "Living under a rule of law entails various suppositions, one of which is all persons are entitled to be informed as to what the State commands and forbids." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (internal citations omitted). Thus, the void-for-vagueness doctrine, having its roots in due process, requires that prohibitory statutes define the conduct proscribed with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." [15] *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). In the majority of cases, the void-for-vagueness doctrine has been applied to criminal statutes. It also has been applied to civil statutes, however, and for over forty years, courts likewise have examined deportation statutes for a constitutionally required degree of specificity. *See Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951) (finding application of the void-for-

vagueness doctrine to deportation statutes appropriate in light of the "grave nature of deportation"); *United States v. Ayala,* 35 F.3d 423, 425 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1365, 131 L.Ed.2d 221 (1995).

■ The statute challenged here, § 241(a)(4)(C)(i) of the INA, provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1251(a)(4)(C)(i). It simply cannot be disputed, and indeed the government does not,[16] that the statute provides absolutely no notice to aliens as to what is required of them under the statute. Simply stated, it "contains no standard for determining what a suspect has to do in order to satisfy" its requirements. *Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858 (holding that statute requiring citizens to provide "credible and reliable identification" when stopped by the police was void-for-vagueness). *See also Papachristou,* 405 U.S. at 163, 92 S.Ct. at 844 (finding vagrancy statute impermissibly

---

strictly by the grace of Congress, all deportation statutes are, by nature, constitutional deprivations of liberty. Plaintiff lawfully entered this country almost a year ago and has expressed no other intention than to go to Spain. It is true that plaintiff has neither a constitutional right to be here or go to Spain. As the Supreme Court has stated, however, "One may not have a constitutional right to go to Baghdad, but the government may not prohibit one from going there unless by means consonant with due process of law." *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) (quoting *Homer v. Richmond,* 292 F.2d 719, 722 (D.C.Cir.1961)).

**15.** The *Kolender* court also noted that of the two void for vagueness considerations, the prevention of arbitrary enforcement is of paramount importance. *Kolender,* 461 U.S. at 357–58, 103 S.Ct. at 1858–59.

**16.** The government's only argument is that, because plaintiff's void for vagueness challenge is facial, plaintiff must, and has failed to, demonstrate that the statute can never be applied constitutionally under any circumstances. Implicit in this argument is the assertion that if an alien's presence or activities would cause potentially

serious adverse foreign policy consequences, then his or her deportation under § 241(a)(4)(C)(i) would be constitutional. This argument misconceives the nature of a void for vagueness challenge. The danger is not that the statute will be applied to the wrong persons, so that if it could conceivably be applied to the right persons it would be facially constitutional. Rather, among the constitutional defects are that, prior to the Secretary taking action, no alien could know what the Secretary, in his personal judgment, might believe would cause adverse foreign policy consequences, and that the enforcement official, here only the Secretary of State, is afforded, in the government's own words, "unreviewable" and "unfettered discretion" to determine what activities and whose presence are within the reach of the law. Thus, there exists no "unmistakable core that a reasonable person would know is forbidden by the law." *Kolender,* 461 U.S. at 370–71, 103 S.Ct. at 1865 (White, J., dissenting). This court is in no way concerned with whether plaintiff's presence in this country will frustrate the foreign policy of the United States. That is a question for the Secretary alone. Because the "standards" in § 241(a)(4)(C)(i) lie purely within the Secretary's personal and undisclosed judgment, however, the statute is unconstitutionally vague, both as applied to plaintiff and on its face.

vague because it criminalized "activities which by modern standards are normally innocent" and thereby failed "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute"); *Jordan v. DeGeorge,* 341 U.S. at 230, 71 S.Ct. at 707 ("statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law").

Traditionally, where a deportation statute lacking specificity is challenged for vagueness, courts have looked to surrounding statutes, the legislative history and common linguistic understandings to determine whether a particular word or phrase is so vague as to render the statute unconstitutional. In *Jordan v. DeGeorge,* an alien challenged the phrase "crime involving moral turpitude" as being void for vagueness. 341 U.S. at 229–232, 71 S.Ct. at 707–09. There, the Supreme Court held that the phrase was not unconstitutionally vague as it had been a part of the immigration laws for over half a century and long had been construed by courts as an element of offenses in a host of other statutes. *Id.* at 230–31, 71 S.Ct. at 707–08. While the phrase certainly was open to judicial interpretation, there existed guideposts sufficient to create a common understanding of the phrase. *Id.* Moreover, the statute did not define a deportable offense, but merely rendered deportable any alien who was twice convicted of having committed certain crimes involving moral turpitude. Thus, the statute provided adequate notice, at least to the extent that if an alien behaved him or herself and did not violate the traditionally well-defined penal laws, the alien could rest assured that he or she would not be deported, at least under that statute.

Similarly, in *Boutilier v. INS,* 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), the question before the Court was whether a statute rendering excludable any alien with a "psychopathic personality" was void for vagueness if it could be used to exclude homosexuals. The Court first recognized that the phrase "psychopathic personality" is a medically ambiguous term. The Court then found, however, that in the statute's legislative history, Congress expressly enumerated certain conditions that were considered "psychopathic," including homosexuality. *Id.* at 123–24, 87 S.Ct. at 1566–67. In light of the explicit legislative history, the Court could not find the statute to be unconstitutionally vague.[17] *Id.* at 124, 87 S.Ct. at 1567.

The question, then, is whether § 241(a)(4)(C)(i) of the INA contains a recognized standard and whether its "language conveys [a] sufficiently definite warning as to the proscribed conduct when measured against common understandings and practices." *Jordan,* 341 U.S. at 231–32, 71 S.Ct. at 708. Clearly it does not. While there may be a common understanding, in a definitional sense, of what "foreign policy" is, no one outside the Department of State and, perhaps, the President ever knows what our nation's frequently covert foreign policy *is* at any given time. Thus, there is no conceivable way that an alien could know, *ex-ante,* how to conform his or her activities to the requirements of the law. Of course, it is even less likely that an alien could know that his or her mere presence here would or could cause adverse foreign policy consequences when our foreign policy is unpublished, ever-changing, and often highly confidential.[18]

---

**17.** Interestingly, the Court also noted that the void-for-vagueness doctrine would not apply to an immigration statute that did not proscribe an alien's conduct in the United States, but merely defined pre-existing conditions or afflictions that rendered an alien excludable before he or she ever reached our shores. *Id.* at 123, 87 S.Ct. at 1566. (Curiously, the exclusion statute in *Boutilier* was just such a statute.) By its terms, of course, § 241(a)(4)(C)(i) does address an alien's presence or activities *in the United States.*

**18.** Even statutes rendering deportable an alien whose activities endanger the "public safety" or

jeopardize the "national security" contain recognizable and judicially manageable, though not wholly precise, standards. 8 U.S.C. § 1251(a)(4)(A)(ii). Clearly, any alien would know that blowing up the World Trade Center or spying for a foreign sovereign would justify his or her deportation under these statutes. That is because, under these statutes, deportation is a consequence solely of the alien's conduct measured against standards with common understandings. Conversely, whether one's "presence or activities in the United States" may cause "potentially serious adverse foreign policy consequences" for the United States is almost exclu-

Even under *Boutilier,* where conduct was not an issue, the statute, read in conjunction with its legislative history, provided notice (though somewhat fictitiously so) that homosexual aliens were excludable. 387 U.S. at 124, 87 S.Ct. at 1567. Thus, if a homosexual were to risk entering this country, he or she likewise would knowingly risk being deported at any time. Under § 241(a)(4)(C)(i), however, all *legal* aliens, whether here for a day or fifty years and visiting or resident in this country, must live in fear of the Secretary of State informing them, at any time, that our foreign policy requires their deportation to a particular country for reasons unknown to them and beyond their control and, as here, merely because they are present. But the Constitution requires that aliens, like citizens, be adequately apprised of what the law requires. Section 241(a)(4)(C)(i) fails to do just that.

■ Related to the void-for-vagueness doctrine's notice requirement is "the requirement that the legislature establish minimal guidelines to govern law enforcement," *Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858, so as not to permit "arbitrary and erratic" applications of the law, *Papachristou,* 405 U.S. at 162, 92 S.Ct. at 843. Here, again, the statute fails to pass constitutional muster. Rather than providing the Secretary of State with a definite standard, § 241(a)(4)(C)(i) grants the Secretary unfettered discretion. The only conceivable standard contained in the provision would be the phrase "potentially serious." 8 U.S.C. § 1251(a)(4)(C)(i). Un-

fortunately, the statute does not clarify that phrase. In addition, the scant legislative history is equally uninformative. In the Conference Report's only reference to the phrase, it merely states that it requires a "clear negative foreign policy impact" associated with the alien's presence or activities, but that the term "potentially serious" embodies a "significantly" lower standard than the term "compelling." H.R.Conf.Rep. 101–955 at 129 (1990). Of course, the inadequacy of legislative history does not make a law any less valid. It also does not make it any less vague. Absent definiteness and immediacy requirements, the range of circumstances that could warrant deportation under § 241(a)(4)(C)(i) is virtually boundless.[19]

■ This court recognizes that neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions on matters of foreign policy. As discussed above, this nation's foreign policy is an ever-changing amalgamation of interests and alliances often known only to the Secretary, himself. The court acknowledges, therefore, that Congress could not have statutorily dictated to the Secretary the seriousness of particular foreign policy consequences. The fact remains, however, that Congress cannot hide behind this required deference as a justification for granting the Secretary carte blanche to declare an alien's deportability at will. In other words, the fact that Congress might not have been able to provide more definite stan-

sively a function of what our foreign policy is at the time, as opposed to what a particular alien has done or the existence of particular traits that a alien may possess. Moreover, as the case at bar suggests, an alien's deportation under § 241(a)(4)(C)(i) could be based on nothing more than the obstinacy of a foreign sovereign that is high on the list of nations that the United States must not offend or disappoint.

19. Imagine, for a moment, how quickly our constitutional hackles would rise if a local police chief were granted the power to arrest any person whose mere presence would cause potentially serious adverse consequences for the public peace. It is of no consequence to the void-for-vagueness analysis that foreign policy is a particularly important concern. Even when legislating in the arena of foreign affairs, Congress cannot grant the executive "totally unrestricted freedom

of choice." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). *See also Rafeedie v. INS,* 880 F.2d 506, 523 (D.C.Cir. 1989) (opinion of the court) ("even a manifest national security interest of the United States cannot support an argument that Rafeedie [the alien plaintiff] is not entitled, as a threshold matter, to protection under the Due Process Clause"). Nor is it relevant to the void-for-vagueness inquiry that, intuitively, we might trust the discretionary judgment of the Secretary of State more so than we would the judgment of a local police chief. Deportation statutes are examined under the "established criteria of the 'void for vagueness' doctrine." *Jordan v. De-George,* 341 U.S. at 231, 71 S.Ct. at 708. If the hypothetical police chief statute would be void for vagueness (as it obviously would), then so, too, must be § 241(a)(4)(C)(i) of the INA.

dards does not excuse it from its constitutional obligation to do so.

■■■■ "Foreign policy" cannot serve as the talisman behind which Congress may abdicate its responsibility to pass only sufficiently clear and definite laws when those laws may be enforced against the individual. *See Shahla v. INS*, 749 F.2d 561, 563 n. 2 (9th Cir.1984) ("the judicial branch may examine whether the political branches have used a foreign policy crisis as an excuse for treating aliens arbitrarily"). Although the executive's discretionary authority over foreign affairs is well established, Congress cannot empower the executive to employ that authority against the individual except through constitutional means. *See Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 9, 57 S.Ct. 100, 102, 81 L.Ed. 5 (1936) ("the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law. There is no executive discretion to surrender him to a foreign government, unless that discretion is governed by law").[20] If the Constitution was adopted to protect individuals against anything, it was the abuses made possible through just this type of unbounded executive authority.

There can be no more graphic illustration of the exercise of unbounded executive authority than that seen in this case. In this case, the Secretary has determined that plaintiff is expendable—for "foreign policy" reasons which the Secretary need neither explicate nor defend—merely because Mexico wants plaintiff back. Had plaintiff overstayed his welcome, had he entered this country illegally, or had he committed a crime while here—all clearly defined grounds for deportation—he would be entitled to a host of protections, not the least of which would be notice of the prohibited conduct and a meaningful opportunity to be heard. Similarly, if it were believed that plaintiff had committed a crime in Mexico, his extradition would, presumably, have again been sought and, again, there would be no problem of vagueness and he would be entitled to substantial protections. Extradition, after all, is the time-tested mechanism used by this country and other civilized countries to send a criminal back, a mechanism that the government has unsuccessfully utilized vis-a-vis plaintiff in four separate court proceedings. § 241(a)(4)(C)(i) does an end run around and, indeed, subverts the extradition framework, which would never permit the return of an alien merely because he is considered undesirable by his government.

In *Papachristou*, the Supreme Court was concerned that without clear legislative standards, "[a] vagrancy prosecution may be merely the cloak for a conviction which could not be obtained on the real but undisclosed grounds for the arrest." 405 U.S. at 169, 92 S.Ct. at 847. Because the vagrancy statute at issue provided no means of preventing such abuses, the statute was void for vagueness. *Id.* So, too, is § 241(a)(4)(C)(i). It affords precisely the "unrestrained power" that the Court found to be unacceptable in *Kolender*, 461 U.S. at 360, 103 S.Ct. at 1859–60, and "entrusts lawmaking to the moment-to-moment judgment," *id.*, of the Secretary. And interestingly—the death knell to any suggestion that the statute should be accorded a presumption of constitutionality—the sparse legislative history reveals that even Congress did not know what § 241(a)(4)(C)(i) meant.[21]

---

**20.** The government argues that *Valentine* actually supports its position because § 241(a)(4)(C)(i) is just such a statutory grant of discretion to the executive. At issue in *Valentine*, however, was the executive's discretion to act under an extradition treaty that clearly defined the extraditable offenses and limited the executive's extradition power to situations in which there was "evidence sufficient to sustain the charge" of criminality. *Valentine*, 299 U.S. at 6, 10, 57 S.Ct. at 101, 103. When the President attempted to act beyond the scope of the treaty, the Court insisted that there be a "statute conferring an independent power." In *Valentine*, no such statute existed. Thus, the Court did not have to reach the next question and the question which is now before this court: whether, where a statute does exist, the statute must be constitutional. Obviously, it must be. That is, it, like all statutes, must satisfy the "constitutional requirements of definiteness and clarity." *See Kolender*, 461 U.S. at 361, 103 S.Ct. at 1860. If it does not, the statute is void.

**21.** When § 241(a)(4)(C)(i) originally was drafted, it contained, and still does, a exception which provided that an alien could not be deported for his or her current or past beliefs, statements or associations if such would be lawful within the

Of course, this court in no way means to imply any wrongdoing on the part of the Secretary of State in this case. The fact remains, however, that § 241(a)(4)(C)(i) authorizes a heretofore unknown scope of executive enforcement power vis-a-vis the individual with utterly no standards provided to the Secretary of State or to the legal aliens subject to its provisions. Section 241(a)(4)(C)(i) is void for vagueness.

### B. *Opportunity to be Heard*

For many of the same reasons that § 241(a)(4)(C)(i) is void for vagueness, the statute also deprives aliens such as plaintiff of due process of law by denying them a meaningful opportunity to be heard. It is hornbook constitutional law that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests" recognized under the Fifth and Fourteenth Amendments. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). In addition, it cannot be questioned that aliens are entitled to due process of law in deportation proceedings. *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). It is equally clear, however, that aliens are not entitled to the full panoply of procedural protections afforded to defendants in criminal cases. As with all due process determinations, then, it is the task of the court to determine what process is due under the circumstances.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. at 333, 96 S.Ct. at 902 (citing *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646–47, 95 L.Ed. 817 (1951)) (Frankfurter, J., concurring) (stating that the "right to be heard before being

United States. 8 U.S.C. § 1251(a)(4)(C)(ii). When the bill emerged from the Conference Committee, however, a limitation on the exception had been added which rendered the exception inapplicable if the Secretary of State personally were to determine that the alien's presence or activities "would compromise a compelling United States foreign policy interest." *Id.* When the legislation was again presented to the Senate, several members expressed their concern:

> Mrs. KASSEBAUM. ... This expansion of the Secretary's *discretion* was not part of either the Senate or House versions of this legislation. It was not debated or discussed by either body or by the committees of jurisdiction.
>
> Yet, we are presented today with a fait accompli-as part of a backroom deal we are making significant changes in U.S. immigration policy.... Yet, we are now in a position where we must either accept this change or risk killing the entire immigration legislation.
>
> Mr. President, I do not believe that this is a responsible way to conduct business in the U.S. Senate. I hope that in the future, we will be more careful in how we consider legislation—conferencing the provisions in the respective bills, not bringing new issues—which have not been discussed or debated—into the legislative process.
>
> Over the next few months, I will closely follow how the Secretary of State makes use of this new authority....
>
> \* \* \* \* \* \*
>
> Mr. MOYNIHAN. Finally, I am concerned by the authority granted to the Secretary of

State to exclude an alien if the alien's admission would "compromise a compelling United States foreign policy interest." Could the Senator explain to me his understanding of this provision?

Mr. KENNEDY. I share the Senator's concern about this provision and have agreed to it only because it has been narrowly circumscribed. To begin with, only the Secretary of State—acting personally—can exercise this authority.... [T]his provision must be used only in the most extreme and unusual cases....

Moreover, the Secretary cannot act unless he personally determines that admission of the alien would actually cause injury to a compelling foreign policy interest. The authority cannot be exercised based on the possibility of injury. The Secretary must satisfy himself that injury would actually occur.

*I would repeat, however, that I share the ·Senator's concern about this provision. I will be watching closely to see how this authority is exercised.*

136 Cong.Rec. § 17114, 101st Cong.2d Sess. (daily ed. Oct. 26, 1990) (emphasis added).

It is clear from this exchange that Congress realized that the phrase "compelling United States foreign policy interest" lacked definite standards and that Congress simply had to hope that the Secretary would not abuse his newly granted authority. While Senator Kennedy's statements indicate that the word "compelling" implies a degree of definiteness, the Conference Report also indicates that "compelling" is a "significantly higher standard" than "potentially serious," and gives absolutely no guidance as to how *that* standard should be interpreted and applied by the Secretary. H.R.Conf.Rep. 101–955 at 129 (1990).

condemned to suffer grievous loss of any kind, even though it may involve the stigma and hardships of a criminal conviction, is a principle basic to our society"). At a minimum, therefore, plaintiff must be given "notice of the case against him and an opportunity to meet it." *Id.* Due process, however, is not a fixed star in the constellation of rights. It is a fluid and dynamic concept that must be tailored to the circumstances of each case. Thus, in order to determine whether the opportunity afforded to plaintiff under the INA is constitutionally sufficient, this court must apply the now familiar three-part balancing test enunciated by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. Phrased in terms relevant to the case at bar, this court must consider: (1) the importance to all aliens of not being imprisoned, forced to leave the United States, and sent to the country of our government's choosing; (2) the adequacy of the hearing afforded and the likelihood that increased procedures would diminish the risk of an erroneous deprivation of liberty; and (3) the governmental interest, as well as that of the public, in allowing the Secretary of State to declare an alien deportable in the interests of our foreign policy as well as the increased cost of requiring additional procedures.

■■■■ Section 241(a)(4)(C)(i) of the INA applies to all aliens, be they temporary visitors or life-long permanent residents. To attempt to measure the importance to these individuals of avoiding the complete deprivation of liberty that results from executive confinement and deportation would near the impossible. For those who have been in this country for a substantial period of time, it would mean the loss of all they had built for themselves here and an irreparable disruption of the lives they had established. For the more recent arrivals, including visitors and tourists, imprisonment likewise would represent the total loss of liberty and, in plaintiff's case, under onerous conditions. In addition, for one in plaintiff's position, deportation means more than being told simply to leave this country. That is exactly what he wants to do. Rather, for plaintiff, deportation means being forcibly sent against his will to the one country he wishes to avoid.

Plaintiff's private interest, and the interest of all aliens similarly situated, that would be affected by imprisonment and deportation is unquantifiably grave.

Presumably because of the near total deprivation of liberty that results from deportation, Congress provided for extensive administrative hearings and procedural protections before an alien's deportability may be declared. First, all determinations of deportability must be made by an Immigration Judge. 8 U.S.C. § 1252(b). Second, section 242(b) of the INA provides that at the hearing before the IJ:

(1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held,

(2) the alien shall have the privilege of being represented ... by such counsel ... as he shall choose,

(3) *the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the government,*

(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

8 U.S.C. § 1252(b)(1)–(4) (emphasis added). Finally, the statute makes clear that this cautious procedure is "the sole and exclusive procedure for determining the deportability of an alien under this section." 8 U.S.C. § 1252(b). Given the severe deprivation of liberty that deportation entails, it can hardly be doubted that these extensive procedures are any more than what is constitutionally required.

In a typical deportation hearing brought pursuant to any section other than 241(a)(4)(C)(i), the IJ will be presented with charges of certain conduct allegedly committed by the alien. After a hearing, the IJ will determine whether the alien engaged in the conduct alleged and whether such conduct warrants deportation under the statute, e.g., whether the alien failed to maintain his nonimmigrant status, 8 U.S.C. § 1251(a)(1)(C), whether the alien was convicted of certain

enumerated crimes, 8 U.S.C. § 1251(a)(2), whether the alien engaged in conduct designed to overthrow the United States government, 8 U.S.C. § 1251(a)(4)(A)(iii), or whether the alien engaged in criminal conduct that endangered the public safety or national security, 8 U.S.C. § 1251(a)(4)(A)(ii). In each of these instances, the alien is given the opportunity to argue that he or she did not engage in the activities alleged, and that if he or she did, the conduct does not meet the statutory requirements for deportability. Thus, the IJ must evaluate conduct proven by "reasonable, substantial and probative evidence" against a clear and measurable statutory standard.

A deportation proceeding instituted under § 241(a)(4)(C)(i) is subject to the extensive administrative hearing requirements contained in § 242(b). Accordingly, the government argues that plaintiff will be afforded an adequate opportunity to be heard. (Def.'s Opp. to Pl.'s Mot. for Temp.Restr. Order at 8–9.) The government's argument, however, misconceives the unique nature of the proceedings instituted against plaintiff. Plaintiff has not been charged with conduct warranting his deportation. Rather, he has been "charged" with the Secretary of State having a reasonable belief that his presence here will cause potentially serious adverse foreign policy consequences for the United States. (Order to Show Cause and Notice of Hearing dated Dec. 21, 1995, Fleming Aff.Exh. H.)

How, then, will plaintiff's § 242(b) hearing unfold? Undoubtedly, he will be present, and will be represented by counsel. What then? Will he be able to make use of his presence and his counsel by having "a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the government?" 8 U.S.C. § 1252(b)(3). In other words, will he have a meaningful opportunity to be heard and to meet the charges against him? The government has represented that the answer is "no."

As the government itself has forcefully argued, plaintiff's deportability (the ultimate issue before the IJ) has been conclusively pre-determined by the Secretary. Accord-

ingly, while plaintiff will be given his § 242(b) hearing before an IJ, the hearing will be a sham. The real decision already has been made off-stage, and, according to the government, that decision is an unreviewable exercise of the Secretary's "unfettered discretion." (Def.'s Reply to Pl.'s Mot. for Inj.Relief at 29.) Thus, the only form that a meaningful hearing under § 241(a)(4)(C)(i) could take would be for Secretary Christopher and President Zedillo to take the witness stand, be cross-examined by plaintiff, and submit the reasonableness of their positions to the judgment of the IJ. The notion is ludicrous. The government has repeatedly asserted, and this court agrees, that plaintiff is not entitled to probe the grounds or the reasonableness of the Secretary's decision. Thus, the only opportunity afforded to plaintiff is the right to be present with counsel when the IJ rubber-stamps the Secretary's October 2, 1995 letter. It is certainly convenient for the government that, after four times failing to show even probable cause that plaintiff engaged in criminal activity when he was given the opportunity to be heard, Congress has paved the way for the government now to move against plaintiff without allowing him a chance to challenge whatever it is that has brought him to this point.

■■■■  The government does not deny that plaintiff will be deprived a meaningful hearing. Rather, it contends that, because Congress has committed deportability determinations under § 241(a)(4)(C)(i) to the executive's "unfettered discretion," "[t]he fact that the Secretary of State's letter which lays the predicate for a section 1251(a)(4)(C) deportation is essentially unreviewable poses no constitutional problems." (Def.'s Reply to Pl.'s Mot. for Inj.Relief at 29.) The government grossly misinterprets the law. As the Supreme Court stated over a century ago, the due process clause "is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process 'due process of law' by its mere will." *Murray's Lessee v. Hoboken Land and Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855). On the scale

of deprivations of liberty, executive confinement and deportation of the type pursued here rank only a notch below criminal imprisonment. *See Jordan v. DeGeorge*, 341 U.S. at 231, 71 S.Ct. at 707 ("deportation is a drastic measure and at times the equivalent of banishment or exile ... It is the forfeiture for misconduct of a residence in this country"). In light of the "grave nature of deportation," *id.*, due process requires, at a minimum, that plaintiff be afforded a meaningful opportunity to be heard. Thus, under the second *Eldridge* factor, it is clear that the procedures currently provided by law are woefully inadequate.

■ The final factor that this court must consider is the governmental interest in allowing the Secretary of State to declare an alien's deportability in the interest of foreign policy and the increased cost to the government of requiring additional procedures.[22] The paramount importance of allowing the Secretary of State freely to pursue the interests of our nation's foreign policy cannot be overstated. However, there is no reason to assume that this interest is any more sacrosanct than the public safety, the national security, or the stability of the United States government itself. When an alien has jeopardized one of these concerns, the INA provides him or her with a meaningful

opportunity to rebut the charges. Thus, as important as the nation's foreign policy is, this court is aware of no rationale that would justify this extraordinary grant of discretion given the Secretary of State when other equally lofty interests do not warrant a comparable suspension of an alien's constitutional rights.[23] Finally, the additional administrative costs that would be imposed by granting aliens a meaningful opportunity to be heard prior to their deportation under § 241(a)(4)(C)(i) would be negligible, as experience has shown that such proceedings are few and far between. *See Mathews v. Eldridge*, 424 U.S. at 347, 96 S.Ct. at 908–09 (noting the enormous incremental cost to the government that would accompany the recognition of a constitutional right to an evidentiary hearing prior to the termination of all disability benefits).

In the final analysis, this court is convinced that a balancing of the appropriate factors tips well in plaintiff's favor. Absent a meaningful opportunity to be heard, the Secretary of State's unreviewable and concededly "unfettered discretion" to deprive an alien, who lawfully entered this country, of his or her liberty to the extent exemplified by this case is, in this court's view, unconstitutional. Accordingly, this court now holds that

**22.** The government cannot seriously argue that plaintiff can be denied an opportunity to be heard in light of the government's interest in safeguarding the confidentiality of the Secretary of State's thought processes. The Secretary has published his reasons for ordering plaintiff's deportability in his October 2, 1995 letter, which now is a matter of public record. Moreover, even if the Secretary had not published his explanation, in those due process cases where the government's interest in confidentiality has been held to outweigh the private interests of the individual, those private interests have been nothing compared to the deprivation of liberty in this case. *See, e.g., Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (holding that government's interest outweighed plaintiff's private interest where "[a]ll that was denied her was the opportunity to work at one isolated and specific military installation"). As Justice Frankfurter so eloquently stated in *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168–70, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring):

> Congress has often entrusted, as it may, protection of interests which it has created to administrative agencies rather than to the courts. But rarely has it authorized such agencies to act without those essential safeguards for fair judgment which in the course of centuries have come to be associated with due process....
>
> The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.

**23.** Of course, if Congress cannot devise a scheme under which aliens are given an opportunity to be heard while simultaneously sparing the Secretary's decision making process from an improper degree of judicial or administrative review, the constitutional solution is not for Congress to do it anyway or for this court to rewrite the statute as it may deem appropriate. The challenge of drafting legislation that comports with the requirements of the Constitution is one for Congress, not this court.

§ 241(a)(4)(C)(i) of the INA, 8 U.S.C. § 1251(a)(4)(C)(i) is unconstitutional both on its face and as applied.

## C. *Unconstitutional Delegation of Legislative Powers*

■ For many of the same reasons that § 241(a)(4)(C)(i) of the INA is violative of the due process clause, it also is an unconstitutional delegation of legislative power to the executive. This court is well aware of the fact that, since the New Deal era, in which the relationship between the executive and legislative branches of our government was dramatically transformed, the delegation doctrine has fallen into disfavor as a result of the rejection of what was perceived as the Supreme Court's overreaching in the name of substantive due process. *See Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 686, 100 S.Ct. 2844, 2886, 65 L.Ed.2d 1010 (1980) (Rehnquist, J. concurring). Thus, this court does not tread into this area of the law without some apprehension if not trepidation. The fact remains, however, that the delegation doctrine safeguards the integrity of the separation of powers principle upon which our tripartite system of government was designed, and cannot be allowed to slip irretrievably into obscurity.

■ The Constitution grants the power to make laws exclusively to the people's representatives in Congress. U.S. Const. Art. I § 1. "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field v. Clark,* 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892). It has long been recognized, however, that some level of legislative delegation is necessary to the efficient administration of the ever-broadening regulatory course charted by Congress. Accordingly, "the most that may be asked under the separation-of-powers doctrine is that Congress lay down the general policy and standards that animate the law, leaving the agency to refine those standards, 'fill in the blanks,' or apply the standards to particular cases." *Industrial Union,* 448 U.S. at 675, 100 S.Ct. at 2880–81 (Rehnquist, J., concurring). The

delegation doctrine, then, functions to ensure that Congress will remain the nation's primary policy maker by requiring it to articulate intelligible standards to guide (1) the exercise of the delegatee's authority, and (2) the judiciary's ability to review the exercise of that authority against a congressionally mandated policy. *Id.* at 685–86, 100 S.Ct. at 2885–86. Section 241(a)(4)(C)(i) fails on both counts.

In *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Supreme Court struck down § 3 of the National Industrial Recovery Act ("NIRA") as an unconstitutional delegation of legislative authority to the executive. Section 3 of the NIRA authorized the President to adopt industry wide "codes of unfair competition" proffered by trade or industrial associations if such codes effectuated the policies of the NIRA and would not promote monopolies. *Id.* at 522–23, 55 S.Ct. at 840. The policies underlying the NIRA were articulated in § 1 of the act and included: "to remove obstructions to the free flow of interstate and foreign commerce, ... to eliminate unfair competitive practices, ... to avoid undue restriction of production, ... to increase the consumption of industrial and agricultural products by increasing purchasing power, ... to reduce and relieve unemployment, ... and otherwise to rehabilitate industry and to conserve natural resources." *Id.* at 531 n. 9, 55 S.Ct. at 843 n. 9. Notwithstanding the NIRA's explicit statement of congressional policy, the Court invalidated the statute, concluding that,

> [i]t does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure.... [S]ection 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction and expansion described in section one. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is *virtually unfettered.* We think that the code-making au-

thority thus conferred is an unconstitutional delegation of legislative power.

*Id.* at 541–42, 55 S.Ct. at 848 (emphasis added).

As the court recognized, the President's discretion was not completely unlimited. The codes that he adopted were required to further the policy objectives of the NIRA and could not promote monopolies. That, however, was not enough to save the statute from invalidation. Section 241(a)(4)(C)(i) of the INA contains even less of a policy statement than did the NIRA. The only congressional policy that can be gleaned from the statute is that foreign policy *can* trump a legal alien's right to remain in this country if the Secretary believes that it should. Such a policy, if policy it be, cannot suffice to save the statute from invalidation. The "policy" is purely precatory and, rather than guiding the Secretary's exercise of authority, does little more than inform him that Congress has given him the absolute power to deport.

In light of the inadequacy of the congressional statement of policy underlying § 241(a)(4)(C)(i), this court must examine whether the statute contains sufficiently intelligible standards to direct the Secretary's exercise of discretion and to enable a court to review the exercise thereof. Although the parties have not raised the delegation issue in their submissions, the government relies on a line of cases for the proposition that, in regard to legislation with foreign policy implications, Congress must be allowed to delegate broader discretion to the President and his agents out of respect for the executive's residual authority over foreign affairs and the impracticability of requiring Congress to dictate with precision in an area in which it lacks the expertise to do so. While this court cannot disagree with government's basic premise, an examination of the cases on which the government relies serves only to further convince this court that the unprecedented delegation at issue here is, indeed, unconstitutional.

In *United States v. Curtiss–Wright Export Corporation,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) the Supreme Court upheld the constitutionality of a statutory delegation relating to foreign affairs, finding that, under the circumstances, the statute was sufficiently precise. In arriving at its conclusion, the Court recognized that Congress "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Id.* at 320, 57 S.Ct. at 221. The Court's refusal to strike down the provision as an unconstitutional delegation, however, must be understood in the context of the detailed statute that was before the Court. The statute there at issue authorized the President to prohibit the sale of arms to countries then engaged in armed conflict in the Chaco region of South America if he were to find that the prohibition would contribute to the establishment of peace in that region. *Id.* at 312, 57 S.Ct. at 217. Such specificity, when compared to the blanket grant of discretion in § 241(a)(4)(C)(i) of the INA, renders *Curtiss–Wright* inapposite to the case at bar for all but the broadest of principles.

The government also relies on *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), in which the Supreme Court reaffirmed and refined its holding in *Curtiss–Wright.* The government cites *Zemel* for the proposition that,

> because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.

*Id.* at 17, 85 S.Ct. at 1281. In the very next sentence, however, which the government does *not* cite, the Court stressed that "[t]his does not mean that simply because a statute deals with foreign relations, it can grant the Executive *totally unrestricted freedom of choice.*" *Id.* (emphasis added). That is exactly what Congress has done with § 241(a)(4)(C)(i) of the INA.

In *Zemel,* the statute before the Court was the Passport Act of 1926, which provided that the "Secretary of State may grant and issue

passports ... under such rules as the President shall designate and prescribe for and on behalf of the United States." *Id.* at 7–8, 85 S.Ct. at 1276. The Court held that the act's broad language could be read to contain sufficiently precise standards only because the powers granted to the Secretary of State under the act had previously been limited by the Court to those specific practices in which the executive had engaged at the time the statute was enacted by Congress. *Id.* at 17–18, 85 S.Ct. at 1281–82. That way, it could be presumed that Congress granted the Secretary the authority to act only in ways of which Congress was already aware and of which Congress presumably approved. Thus, the Court held that *"[s]o limited,* the Act does not constitute an invalid delegation." *Id.* at 18, 85 S.Ct. at 1281 (emphasis added).

The Supreme Court's reasoning in *Mahler v. Eby,* 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924), provides a further example of the extent to which Congress may delegate to the executive in deportation statutes. There, the Supreme Court entertained a delegation challenge to an INA provision rendering "undesirable" aliens deportable. Faced with an otherwise standardless term, the Court looked to the provision's statutory context and found that the Immigration Acts of 1802 and 1917 sufficiently clarified its meaning. *Id.* at 40–41, 44 S.Ct. at 286–87. Those and other statutes shed light on the term "desirable residents" as being persons "of good moral character, attached to the [principles of] the Constitution of the United States, and well disposed to the good order and happiness of the same." [24] *Id.* at 40, 44 S.Ct. at 286–87. The Court thus concluded that, "[o]ur history has created a common understanding of the words 'undesirable residents' which gives them the quality of a *recognized standard." Id.* (emphasis added).

Here, the government has offered no means of limiting the Secretary's authority under § 241(a)(4)(C)(i) by reference to the text, related statutes, legislative history, or common understandings. Neither can this

court conceive of a way to judicially circumscribe the discretion afforded to the Secretary so as to impose a "recognized standard" upon the Secretary's otherwise "totally unrestricted freedom of choice." As this court discussed in relation to the void-for-vagueness analysis, the "potentially serious" standard contained in § 241(a)(4)(C)(i) is wholly illusory. First, the term "potentially" removes any definiteness or immediacy requirements that may otherwise have been attributable to the statute's directive. In addition, the paltry legislative history discussed above indicates that the phrase "potentially serious" is something less than "compelling," but that it imposes no floor or balancing equation to guide the Secretary in the exercise of his delegated authority. Indeed, the Conference Report reveals that Congress itself had no idea what standards might be embodied in the phrase "compelling," and, *a fortiori,* what limitations were contained in the lower threshold of "potentially serious."

More importantly, the Supreme Court's recent nondelegation jurisprudence has emphasized that the adequacy of the standards provided to a delegatee cannot be evaluated in a vacuum, but must be measured in light of the procedures and standards available to ensure meaningful judicial review. Thus, in *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989), the Court reaffirmed the emphasis on judicial review by stating that "so long as Congress provides an administrative agency with standards guiding its actions *such that a court could 'ascertain whether the will of Congress has been obeyed,'* no delegation of legislative authority trenching on the principle of separation of powers has occurred." *Id.* at 218, 109 S.Ct. at 1731 (emphasis added) (quoting *Mistretta v. United States,* 488 U.S. 361, 379, 109 S.Ct. 647, 658, 102 L.Ed.2d 714 (1989)). In addition, the court cited *American Power and Light Co. v. SEC,* 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946), for the proposition that

---

**24.** The INA also refines the phrase "good moral character" with added specificity at 8 U.S.C.

§ 1101(f).

[i]t is constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. *Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations.*

*Mid–America Pipeline Co.,* 490 U.S. at 219, 109 S.Ct. at 1731 (quoting *American Power and Light Co.,* 329 U.S. at 105, 67 S.Ct. at 142 (emphasis added)). In this way, the Court has brought the focus of the nondelegation doctrine back to its functional core—to safeguard the separation of powers by ensuring that the members of Congress, as the elected lawmaking representatives of the people, remain directly accountable both to their constituents and to the Constitution through the process of judicial review.

The nondelegation issue has most frequently arisen in the context of rulemaking authority having been delegated to a federal agency. In the typical case, then, the rules and regulations promulgated by the agency, as well as their application to a particular set of facts, are reviewable by an Article III court both for the constitutionality of the rules and regulations and for their compliance with the statutory policies and standards dictated by Congress. *See, e.g., Mid–America Pipeline Co.,* 490 U.S. at 218–20, 109 S.Ct. at 1730–32 (cases cited therein). In this way, the judiciary can monitor the executive's activities to ensure that the agency acts only within the bounds of the policies and standards set by the popularly elected legislature. Should an agency be found to have transgressed the congressionally delineated boundaries, it thereby would have unconstitutionally encroached on the legislative power vested exclusively in Congress.

With § 241(a)(4)(C)(i), Congress has delegated discretionary authority to the executive that not only is virtually standardless, but is utterly unreviewable by Article I and Article III courts alike. As discussed in Sections A and B, above, the statute completely deprives plaintiff of a meaningful opportunity to be heard and to rebut the allegations of deportability against him. The other side of that same coin, then, is that the judiciary will be prevented from performing its duty to meaningfully review the Secretary's exercise of his discretion for two reasons. First, because Secretary Christopher and President Zedillo cannot be required to testify and be subjected to cross-examination, a reviewing court will never be privy to the evidence necessary to evaluate the Secretary's determination. Thus, by enacting § 241(a)(4)(C)(i), Congress designed a scheme in which the administrative agent is effectively immunized from the judiciary's essential role of monitoring the constitutionality of the administrative process—a role without which any lawmaking scheme cannot, by design, comport with the separation of powers. Second, even if the Secretary and President Zedillo's thought processes were subjected to judicial review (which itself would violate the separation of powers), the statute contains no articulable policies or minimum standards against which a court could measure the Secretary's determination. If the Secretary testified that deportation is necessary, a court would not possess the competence to say that it is not.

Again, the government implicitly argues that because the exercise of the Secretary's discretion involves matters of foreign affairs which are uniquely within the province of the executive, the delegation is constitutional under the more lenient standard enunciated by the Supreme Court in *Zemel v. Rusk,* 381 U.S. at 17, 85 S.Ct. at 1281. Unlike the authority delegated to the executive in *Zemel,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179, and *Curtiss–Wright,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255, however, the discretionary authority delegated here involves the deprivation of a critical liberty interest of an individual and is shielded from all judicial review.

As this court concluded above, because of the grave nature of the private right at stake, the process that is due an alien in a deportation proceeding requires that the alien be afforded a meaningful opportunity to be heard. As a natural corollary to that conclusion, the decision to deport cannot be left to an agency's unfettered and unreviewable discretion exercisable pursuant to a standardless law embodying only precatory congressional policies. Even in the context of an administrative delegation, "[p]rivate

rights are protected by access to the courts to test the application of the policy in the light of the[ ] legislative declarations." *Mid–America Pipeline,* 490 U.S. at 219, 109 S.Ct. at 1731 (citing *American Power & Light Co. v. SEC,* 329 U.S. at 105, 67 S.Ct. at 142). Section 241(a)(4)(C)(i), however, provides no standards or procedures to allow for judicial review of an agency's discretionary deprivation of an alien's liberty. Accordingly, this court concludes that by leaving deportability determinations to the wholly unguided and unreviewable discretion of the Secretary of State, § 241(a)(4)(C)(i) of the INA represents an unconstitutional delegation of legislative power by which Congress eliminated the judiciary's constitutionally required function of review while abdicating its lawmaking responsibilities in favor of standardless executive discretion.

## IV.

### *CONCLUSION*

For the reasons stated above, this court now finds that § 241(a)(4)(C)(i) of the INA is unconstitutional. Accordingly, the deportation proceedings instituted against plaintiff, pursuant thereto, will be permanently enjoined.

### EXHIBIT

### THE SECRETARY OF STATE

### WASHINGTON

October 2, 1995

Dear Madam Attorney General:

I am writing to inform you that, pursuant to Section 241(a)(4)(C) of the Immigration and Nationality Act, 8 U.S.C. section 1251(a)(4)(C), I have concluded that the presence of Mario Ruiz Massieu in the United States would have potentially serious foreign policy consequences for the United States. Accordingly, I request that you take all steps possible, consistent with the Immigration and Nationality Act and other relevant law, to effect his deportation to Mexico.

My decision to invoke INA section 241(a)(4)(C) with respect to Mr. Ruiz Massieu is based on the following considerations:

As you are well aware, the United States and Mexico have made tremendous progress in the past five years in strengthening one of our most important and vital bilateral relationships. The range of issues that unite our two nations—from combatting international drug trafficking, to addressing vexing problems of legal and illegal migration, to fortifying trade and investment in one of the world's largest and fastest growing markets—is complex and varied.

One aspect of our relationship that has received the utmost attention from both governments is our ability to cooperate to confront criminality on both sides of the border. We have seen successes on this front, but we continue to seek enhanced cooperation. With easy transit between the United States and Mexico and extensive and ever-increasing ties, this is an area of vital importance to the United States. Our inability to return to Mexico Mr. Ruiz Massieu—a case the Mexican Presidency has told us is of the highest importance—would jeopardize our ability to work with Mexico on law enforcement matters. It might also cast a potentially chilling effect on other issues our two governments are addressing.

The Honorable

Janet Reno,

Attorney General.

Furthermore, the case in question involves charges against the former second ranking law enforcement authority in Mexico and a man connected through his circle of family and friends to the center of power in Mexican politics. Serious allegations against such a high former official are unprecedented in modern Mexico. The case against Mr. Ruiz Massieu and the arrest and trial for related crimes of Mr. Raul Salinas, brother of the former President, were the dramatic and unequivocal signs of the determination of President Zedillo and his Attorney General to break the so-called "culture of impunity" that long protected corrupt politicians, officials and other powerful elite from being held accountable for their actions and crimes. President Zedillo's anti-corruption drive has resonated throughout Mexico and continues

to receive strong support from the Mexican people.

The U.S. Government has consistently urged Mexico to take the steps towards reform in its justice system that President Zedillo is so forcefully pursuing. The ability to prosecute Mr. Ruiz Massieu and other powerful individuals in Mexico for the crimes of which they are accused is key to the success of Zedillo's pledge to transform totally the judicial and law enforcement system and to rid Mexico of corruption and abuse of power. Should the U.S. Government not return Mr. Ruiz Massieu to Mexico, our support of such reforms would be seen as hollow and self-serving and would be a major setback for President Zedillo and our combined efforts to chart a new and effective course of U.S.–Mexican relations.

Our efforts to remove Mr. Ruiz Massieu from the United States should be directed at achieving his direct return to Mexico. When apprehended in New Jersey, Mr. Ruiz Massieu was attempting to depart the United States just days after being called for questioning in Mexico with regard to the crimes with which he was subsequently charged. If our efforts to remove him from the United States result in his ability to depart to a destination other than Mexico, the U.S. Government will almost certainly be viewed by Mexican officials and the Mexican public as not only permitting, but also aiding his successful escape from justice.

Accordingly, I have concluded that Mr. Ruiz Massieu's presence in the United States would have potentially serious adverse foreign policy consequences for the United States, as provided for in INA section 241(a)(4)(C). I request that you take all reasonable efforts to ensure Mr. Ruiz Massieu's expeditious deportation from the United States. Further, in light of the Mexican Government's interest in having Mr. Ruiz Massieu returned to Mexico, I also request that you do everything possible, consistent with the Immigration and Nationality Act, to effect his deportation to Mexico.

Sincerely,

/s/ Warren Christopher
Warren Christopher